### WENHOLZ v. NEW AMSTERDAM CASUALTY CO. et al.*

#### No. 16378.

Court of Appeal of Louisiana. Orleans.

May 16, 1938.

*Rehearing denied June 13, 1938.

John Conners and M. C. Scharff, both of New Orleans, for appellant.

Henriques & Mayo, of New Orleans, for appellees.

JANVIER, Judge.

At about ten minutes after six o'clock on the morning of January 3, 1933, at the corner of South Pierce Street and Cleveland Avenue in New Orleans, there occurred a collision between two automobile trucks. One, which we shall call the Seput truck, was being operated on South Pierce Street in an uptown direction by John Anthony Seput, Jr., the minor son—by a former marriage—of the plaintiff, Mrs. Victorine Barbier Wenholz. The other truck was owned by New Orleans Ice Cream Company, Inc., and was proceeding on Cleveland Avenue towards Lake Pontchartrain, being driven by Adam Newell within the scope of his employment by the said ice cream company. The accident occurred before daybreak. The Seput truck, driven by petitioner's son, had approached the intersection from the right of the other truck and, hence, was entitled to claim the right of way, assuming that they reached the intersection at about the same time. See Ordinance No. 13,702 C.C.S. As a result of the collision the Seput truck was turned over and young Seput received injuries. On January 21, which was the eighteenth day after the accident, he, according to the petition and to the proof, "became acutely ill * * * with an acute pain in the abdomen, * * * was sent to the Hotel Dieu and operated on the same day" for appendicitis. Later, on January 27th, it was found necessary to perform another operation. He died on January 29th.

Petitioner, his mother, charges that the accident resulted solely from fault on the part of Newell, the driver of the other truck, and she avers that the condition of the appendix which made the operations necessary was the direct result of the injury sustained in the accident and she alleges, therefore, that the death was caused by the said fault of Newell, the driver of the other truck. She prays for solidary judgment in the sum of $25,000.00 against Adam Newell, New Orleans Ice Cream Company, Inc., and New Amsterdam Casualty Company, the liability insurance carrier of the other corporate defendant.

She charges fault in Newell in that he drove his truck into the intersection without looking ahead, without having it under control and in violation of the right of way feature of the traffic ordinance to which we have already referred.

Defendants filed what they term a "plea in bar," basing it on the fact that shortly after the accident Mrs. Wenholz demanded $40.00 for the injuries sustained by her son and, having been paid that amount, executed a full and complete release. After filing the "plea in bar" defendants denied that there was any negligence on the part of Newell, averring that the cause of the collision was the carelessness of Seput in driving his truck, without lights, into the intersection at high speed and without stopping before entering it. Defendants also and especially deny that the injuries received by Seput in the accident had any connection whatever with the subsequent condition of his appendix, or with his ultimate death.

The District Judge overruled the "plea in bar" and, while we do not find his reasons in the record, we do find reference in the record to the fact that the present plaintiff, when she executed the release, had not qualified as the tutrix of the minor, who was still living at the time the release was executed.

After a protracted trial there was judgment in favor of all defendants. Plaintiff has appealed.

Newell admits that when he drove his truck into the intersection he was not aware of the presence of the Seput truck, yet it is quite evident that it was very close because it had almost completed its passage in front of him when he struck it on the left rear, after he had swerved his truck to the left. As explanation for his failure to see the other truck, he charges that it had no lights,

but the evidence on this point is not convincing. In his report to the police he made no mention of this fact. Had the other truck been operated without lights, we cannot believe that he would have failed to mention that fact to the police. On the whole, we find that his contention on this point is not satisfactorily supported by evidence and, from a reading of the record as a whole, we reach the conclusion that he would have been aware of the presence of the other truck had he been properly on the alert. The record shows that between the property line and the curb on the street on which the other truck was approaching, there was a clear space of 15 feet 7 inches, so that, had he been looking ahead and had he entered the intersection at reasonable speed, he could not have failed to see the other truck, which was approaching from the favored direction.

Newell and his helper do not agree as to the extent of care exercised by him before he entered the intersection, he stating that he slowed down and his assistant testifying that he brought the truck to a complete stop.

It is well established that later in the day and even before he returned to his own home, Newell called on young Seput, expressed regret for the accident and, in effect, admitted that it had been caused by his fault.

Mrs. Anita Kramer, an aunt of Seput, testified that she heard Newell say to Seput that "he had to speed to make up his route." This witness also said Newell "shook hands with me and said not to make it hard on him."

Another witness, plaintiff's sister-in-law, testified that Newell said "he would admit it was his fault as he was speeding * * ." Newell himself gave evidence of the speed at which he drove his truck into the intersection when he stated that when he applied his brakes and turned to his left, "the rubber was burned from swerving and I almost turned over in swerving."

■ We reach the conclusion that the accident resulted from the fact that Newell entered the intersection without exercising care to avoid any vehicles which might have approached from the favored direction and that he did so at a speed which made it impossible to stop his truck before striking any such vehicle and that, therefore, the responsibility for the accident rests upon him.

■ The injuries sustained by Seput, of which there was external evidence, were of minor importance. They were described by Dr. Salatich, who attended him, as "contusions, bruises and lacerations" and "brush burns," but at that time there was no suggestion of serious internal complications except that the doctor referred to states that he found the abdomen "quite sensitive throughout." The first examination was made on January 3d, the day on which the accident occurred. Seput was treated for these minor injuries on January 4th, January 7th and January 11th, on which last occasion a suture was removed from his lip. His physician stated that on that day his abdomen was a little sensitive, but better than at the time of the first examination.

That it was not then thought that he had sustained serious injuries is made evident by the fact that his mother, on January 10th, made demand on the ice cream company for $40.00, stating that her son was "slightly" injured. This $40.00 was paid to her on January 13th and she, as the "guardian" of her son, executed a full and complete release and agreed to indemnify and hold the said ice cream company harmless against any further claims.

After leaving the physician on January 11th, Seput did not call on him again until January 21st, at which time an examination showed that he was suffering from acute appendicitis. An operation was immediately performed. In the meantime, he had been employed by and had worked satisfactorily as a pipe-fitter's helper for the Todd Engineering Dry Dock Company on January 17th, 18th and 19th. In his work he was employed "fitting pipe on boats and steamships." His foreman stated that his work consisted in "handling iron" and said "that is not easy." When Seput returned to Dr. Salatich on January 21st, it is obvious that he reported to him that he had sustained a fall into the hold of a ship only a few hours before, for the hospital record shows that certain bruises which were on Seput were "probably accounted for by the recent injuries which patient sustained—an automobile accident two weeks before, and falling into, the hold of a ship 24 hours before the acute appendicitis started."

It is not contended—even by Dr. Salatich —that the automobile accident caused any direct injury to the appendix. His theory is that there were internal bruises sustained by other portions of Seput's intestines

which "could lower the resistance of this region" and which rendered the appendix—if not in perfect condition—more susceptible. Dr. Salatich stated, however: "I cannot say what would cause the appendicitis."

As against the opinion that the appendicitis had resulted from the injuries received in the automobile accident, the record contains an array of medical testimony that there could not have been any possibility of relationship between the accident and the necessity for the operation. These experts were either present when Dr. Salatich described the operation and his findings on performing it, or in hypothetical questions were advised fully and fairly of the conditions which were discovered. Without exception or equivocation they stated that the minor injury sustained on January 3rd had no connection whatever with the diseased appendix which was removed on January 21st.

Dr. William P. Bradburn, a surgeon of many years' experience, stated: "I cannot see that any connection between the two exists."

Dr. Charles Duval, a pathologist whose ability is beyond question, said: "I don't think it could have anything to do with it." He further said: "I think the appendicitis in this case, which developed some two or three weeks after the alleged injury or auto accident, was purely coincidental."

The late Dr. C. Jeff Miller, about whose ability it might be said that "none knew him but to praise," was also asked "whether you think an accident that could have happened on January 3rd could have caused that appendicitis for which he was operated on January 21st." He answered: "I don't think by any of the laws of pathology that you could connect the two."

Dr. William H. Harris, who had had twenty-eight years' practice specializing in pathology and bacteriology, was asked whether he could "conceive of bruises three, or six, or nine inches from the appendix, with normal structure in between and an acute appendix present, occurring as the result of such bruises." He answered: "I cannot conceive of that being the case."

Dr. George F. Roeling, for nine years coroner of Orleans Parish, testified that young Seput's death had occurred while he was coroner. He stated that his office was advised that the body was about to be interred and that, since he had informa-tion that the boy had had a previous automobile injury and since Dr. Salatich told him that he "would be appreciative of an autopsy being held, he stopped the funeral procession and performed the autopsy." He therefore knew that the contention would be that the accident had created the necessity for the operation. He was looking to see whether there was any evidence of trauma. In fact, he was asked whether he had "performed the autopsy to determine whether this boy's death was caused by an accident or some traumatism that he received." He said that he had performed it for that purpose and that "at the time of our autopsy, in a most carefully made examination, we found no evidence of trauma or injury."

We think it unnecessary to say more. The other experts point out in several particulars weaknesses in the chain on which plaintiff's surgeon relied. We need not go into details concerning those matters. Suffice it that we say that we are convinced that there was no connection whatever between the death and the accident. Therefore, plaintiff cannot recover from these defendants for the loss which she sustained in the death of her son.

However, in addition to the claim for damage which she has sustained by reason of the death, she makes claim for the inherited damage to which she says she is entitled by reason of the effect of article 2315 of the Civil Code. We note that the mother is one of the survivors mentioned in the article as being entitled to claim such amount as the deceased himself could have claimed had he lived and we are not favored with argument on the question of whether such survivors as are mentioned in the article may present the so-called "inherited" claim even where the death has resulted from causes in no way connected with the facts which brought into existence the "inherited" claim. Assuming, however, that the mother is entitled, as a survivor under the article, to assert the claim which the deceased could have presented had he lived, it appears here that she has already been paid for this claim, has receipted for that payment, and has agreed to indemnify and hold harmless the defendants against any further demand. It is true that, when she accepted the payment, she did so for and on behalf of the minor, and it is equally true that, since she was not qualified to act for the minor, her acceptance would not have been effective against him, had he

survived. But it is nonetheless true that she did receive the payment and that she received the exact amount which she herself fixed as representing the damage sustained. Therefore, even though she received it in a capacity in which she was not authorized to act, having received it, she cannot assert the same claim again. Though her receipt cannot be pointed to as evidencing a settlement on behalf of the minor, nevertheless it can be relied upon as showing that she herself received that amount.

It is therefore ordered, adjudged and decreed that the judgment appealed from be and it is affirmed at the cost of appellant.

Affirmed.